**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DONALD E. TAYLOR,          )
                               )
      Plaintiff,           )    No. 10 C 7125
                               )
      v.                )    Magistrate Judge Mason
                               )
MICHAEL J. ASTRUE,        )
    Commissioner of Social Security,   )
                               )
      Defendant.       )


**MEMORANDUM OPINION AND ORDER**

MICHAEL T. MASON, United States Magistrate Judge.

      Claimant Donald E. Taylor ("Taylor" or "claimant") brings this motion for summary judgment [14] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Taylor's claim for Disability Insurance Benefits under Sections 216 and 223 of the Social Security Act (the "SSA"), 42 U.S.C. §§ 416(I) and 423(d). The Commissioner now requests that we uphold the decision of the Administrative Law Judge [16]. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment [23] is denied.

## I. BACKGROUND

### A. Procedural History

      On October 23, 2007, Taylor filed a Title II application for Disability Insurance Benefits ("DIB"), alleging disability beginning November 15, 2005 due to a back injury

suffered at work and complications from his HIV infection.  (R. 56.)  Taylor's claim was

initially denied on January 18, 2008.  (R. 59.)  He filed for reconsideration on February

6, 2009, and his claim was once again denied on March 28, 2009.  (R. 57, 630.)  On

April 18, 2009, Taylor filed a request for a hearing, which was held on December 21,

2009.  (R. 15.)  On March 19, 2010, Administrative Law Judge Sherry Thompson (the

"ALJ") issued her decision denying claimant benefits.  (R. 26.)  On March 31, 2010,

Taylor made a request for review of the ALJ's decision, which the Appeals Council

denied.  (R. 1, 10.)  After exhausting his available administrative remedies, Taylor filed

this appeal.

**B.  Medical Evidence**

Claimant alleges disability due to a back injury and an HIV infection.  (R. 56.)

Claimant was treated by three different physicians in connection with these ailments: Dr.

Mark Lorenz ("Dr. Lorenz") treated his back injury;  Dr. Gail Gizzo ("Dr. Gizzo") is his

primary care physician and internist; and Dr. James Allen ("Dr. Allen") is an HIV

specialist.

**1. Dr. Lorenz**

Dr. Lorenz first examined claimant for his back pain on July 15, 2004.  (R. 656.)

Dr. Lorenz saw Taylor several times in early 2005, during which time Dr. Lorenz

experimented with various work restrictions to accommodate Taylor's back problems.

(R. 348-51.)  At a visit on September 8, 2005, Taylor indicated that he could no longer

live with the injury, and Dr. Lorenz and Taylor discussed Taylor's surgical options. (R.

348.)  On November 22, 2005, claimant had an MRI of his lumbar spine.  (R. 347.)  The

scan revealed mild spondylotic changes similar to a previous MRI in May of 2004. (*Id.*) These changes included a left paracentral disk herniation at L5-S1 and a central disk protrusion at L4-L5 with mild stenosis. (*Id.*)

On February 22, 2006, Taylor underwent back surgery. (R. 337.) Specifically, he had an L4-L5 and L5-S1 transforaminal lumbar interbody fusion, and posterior spinal fusion with allograft. (*Id.*) Initially, it appeared that the surgery had improved Taylor's back problems. (R. 320-21.) However, on July 6, 2006 and August 8, 2006, Taylor complained to Dr. Lorenz that the hardware in his back was now causing him pain and discomfort. (R. 322, 336.) Dr. Lorenz examined him and indicated that Taylor was "acutely tender over the lower sacral screws... He has a well-healed scar. He has pain with forward flexion, again it is out laterally to the incision and consistent with the S1 screw. His strength is 5/5. He has a negative straight leg raise." (*Id.*) An x-ray on this date revealed a posterolateral fusion at L4-S1 with pedicle screw placement at L4, L5, S1 and interbody fusion. (*Id.*) At this point, Dr. Lorenz recommended that Taylor refrain from any work until he receives a lumbar hardware injection to help the pain. (*Id.*)

On September 5, 2006, Dr. Lorenz reported that Taylor did receive a lumbar hardware injection and that this did help with the pain. (R. 332.) However, on November 2, 2006, Taylor continued to complain of back pain due to the hardware in his back. (R. 329.) Dr. Lorenz noted that although the injection had helped for a period of time, the claimant was still in pain after sitting or standing for extended periods of time and they should consider removing the hardware. (*Id.*) X-rays from this date showed "good posterolateral fusion on the left L4-L5 and L5-S1," "good fusion on the right L5-S1," and "adequate fusion on the right L4-L5." (*Id.*)

On December 14, 2006, Taylor told Dr. Lorenz that he was still experiencing back pain due to the hardware and he wished to have it removed. (R. 326.) On March 12, 2007, Taylor had surgery to remove the hardware. (R. 316.) At this time, Dr. Lorenz noted that Taylor had a well-healed scar of his lumbar spine, his strength was 5/5 in his lower extremities, and he had a negative straight leg raise. (*Id.*)

On March 27, 2007, Dr. Lorenz examined Taylor post-surgery and noted that Taylor was still experiencing some aching in his back, but the wound looked excellent and he was neurologically intact. (R. 314.) Dr. Lorenz recommenced that they allow the wound to heal for another two or three weeks before beginning a course of physical therapy. (*Id.*)

On April 24, 2007, Taylor visited Dr. Lorenz for a check up and complained of continued aching in his lower back. (R. 313.) Claimant described his pain as a 3 out of 10 on the VAS scale. (*Id.*) Dr. Lorenz recommended that Taylor resume physical therapy but remain off work until a Functional Capacity Assessment ("FCA") could be performed. (*Id.*) Again, Dr. Lorenz noted that claimant was "neurologically intact" and the "[w]ound healed excellently." (*Id.*) His recommendation was that claimant begin physical therapy for core strength for about four weeks, and then complete an FCA. (*Id.*) Dr. Lorenz stated: "We will be releasing him with some restrictions. He is to be off work in the interim." (*Id.*)

On June 26, 2007, Taylor again returned to Dr. Lorenz and complained of increasing back pain. (R. 310.) Dr. Lorenz noted that Taylor's x-rays showed that his interbody and posterolateral fusion at L4-L5 and L5-S1 were unchanged, and that he had a well-preserved disk above it. (*Id.*) Dr. Lorenz also noted that Taylor was taking

4

Hydrocodone, and that he takes more on those days he had physical therapy.  (*Id.*)  He further noted that Taylor was guarded and very slow, had difficulty with forward flexion passed 10 to 15 degrees of motion, but that he was able to heel and toe walk without difficulty and he had a negative leg raise.  (*Id.*)  Due to the fact that the physical therapy seemed to cause Taylor additional pain, Dr. Lorenz suspended Taylor's physical therapy and again recommended an FCA.  (*Id.*)  He also stated that claimant was "given no medication today."  (*Id.*)

On July 12, 2007, Dr. Lorenz noted that Taylor did undergo an FCA, which showed him at light duty, with a maximum sitting time of 20 minutes, a maximum standing time of 60 minutes, occasional bending, maximum lifting of 11 pounds frequently, and maximum lifting of 30 pounds occasionally.  (*Id.*)  Dr. Lorenz stated that Taylor was at maximum medical improvement and his injury was a permanent restriction.  (*Id*).  He also stated that Taylor could return to work at light duty.  (*Id.*)  Dr. Lorenz referred Taylor to another surgeon for a second opinion and recommended vocational training, and he stated he would re-examine Taylor on an as-needed basis. (*Id.*)  Dr. Lorenz also stated that "no further intervention is recommended" and "he does not need any more injections" or "further rehab."  (*Id.*)

On February 25, 2008, Dr. Lorenz reexamined Taylor.  (R. 557.)  He noted that Taylor had back pain at a 3/10 on the VAS scale.  (*Id.*)  Taylor stated that his average pain was at 3 or 4 on the VAS scale but that it could get up to an 8.  (R. at 551.)  He indicated that Taylor cannot sit or stand for more than a few hours before needing to lay down to relieve his pain.  (R. 557.)  Dr. Lorenz noted that Taylor claimed that he feels "somewhat improved" overall, but he is unable to return to activities due to the limited

time he can spend sitting, standing or walking.  (*Id.*)  In his notes, Dr. Lorenz also stated that Taylor will likely need to pursue permanent disability given his sitting, standing, and walking restrictions. (*Id.*)

Dr. Lorenz's records indicate that he last examined Taylor on March 3, 2008.  (R. 556.)  On that day, Dr. Lorenz indicated that Taylor still complained of back pain ranging from 3/10 to 8/10.  (R. 556.)  He noted that Taylor expressed difficulty with walking more than ten minutes and experienced fatigue in his right leg when he did walk for extended periods of time.  (*Id.*)  Dr. Lorenz further indicated that Taylor complained of difficulty with sitting more than twenty minutes and needed to frequently lie down to relieve the pain.  (*Id.*)  He indicated that Taylor had no focal weakness, he had a negative straight leg raise, and he is non-tender over the low back to palpation, but has difficulty with forward flexion past ten degrees.  (*Id.*)  A CT scan showed "L4 to S1 fusion with good inner body fusion and good posterial lateral fusion."  It also noted "good filling into the autograft site on the left," "a slight bulge at L3-4 but no herniation, and "a very small spur on the left ... that doesn't appear to be impeding the foramen."  (*Id.*)  He gave Taylor a Vicadin prescription and recommenced that he take them one to three times per week.  (*Id.*)  He also stated that he would only see Taylor on an "as needed basis." (*Id.*)  Lastly, he again noted that Taylor was at maximum medical improvement and that he was totally and permanently disabled from any gainful employment. (*Id.*)  Dr. Lorenz stated that he "will support his application under Social Security Disability."  (*Id.*)

On April 8, 2009, Dr. Lorenz filled out a "Lumber Spine Impairment Questionnaire" in connection with Taylor's claim for disability benefits.  (R. 656.)  Dr. Lorenz indicated that Taylor's prognosis was stable, but he had lingering lower back

pain following a fusion at L4-L5.  (*Id.*)  His report further indicates that Taylor suffers from fatigue, an abnormal gait and muscle weakness, particularly with respect to his right leg.  (R. 657.)  Dr. Lorenz noted that Taylor's pain was at an 8/10 and constantly impaired him.  (R. 658.)  He further indicated that sitting, bending and walking all contributed to Taylor's pain, and he had not been able relieve the pain with medication.  (*Id.*)

   In that same questionnaire, Dr. Lorenz indicated that it was not medically recommended that Taylor continuously sit or stand through an 8-hour work day. (R. 659.)  Additionally, he noted that Taylor would need a 30 minute break from sitting every 60 minutes or so.  (*Id.*)  Dr. Lorenz stated that Taylor could occasionally lift and carry up to 10 pounds, but that he could never lift or carry more than this.  (*Id.*)  He stated that Taylor was incapable of even a low stress position.  (R. 660.)  Dr. Lorenz further indicated that Taylor would need to take unscheduled breaks to rest on an hourly basis throughout the workday, and his impairment would cause him to miss work approximately three days of work each month.  (R. 661.)  Dr. Lorenz indicated that in his medical opinion the earliest date that these symptoms restricted the claimant was December 13, 2007.  (*Id.*)  He stated that he based these conclusions on "serial examinations" of the claimant, as well as the claimant's FCA.  (R. 660.)

   On November 23, 2009, Dr. Lorenz submitted a second form entitled "Multiple Impairment Questionnaire."  (R. 708-15.)  Dr. Lorenz indicated that the claimant had reached maximum medical improvement and was unable to return to gainful employment.  (R. 708.)  He echoed the same restrictions as in his April 8, 2009 questionnaire.  (R. 708-14.)  He also noted that Taylor was "non-tender over the low

back to palpation but he has difficulty on forward flexion through about ten degrees of motion," and "he has pain on extension."  (R. 708.)  He stated Taylor was incapable of even "low stress" because his pain did not allow him to concentrate enough to perform any job duties.  (R. 713.)

### 2. Dr. Gizzo

Dr. Gail Gizzo has been Taylor's primary care physician since October of 2000. (R. 724.)  On January 23, 2006, Dr. Gizzo examined Taylor to provide a preoperative history and physical prior to his initial back fusion surgery.  (R. 752.)  She noted that Taylor had suffered from back pain for several years.  (*Id.*)  She also indicated that Taylor is not currently working and he has been taken off light duty work.  (*Id.*)  Dr. Gizzo cleared Taylor for surgery pending the results of a precautionary x-ray.  (R. 753.)

On July 11, 2006, nearly five months after the surgery, Dr. Gizzo examined Taylor again.  (R. 748.)  Dr. Gizzo noted that since the surgery, Taylor had been in physical therapy with no marked improvement of his condition.  (*Id.*)  She observed that Taylor's gait was within normal limits, but that he had difficulty lying and then sitting back up due to back pain complaints.  (*Id.*)

On January 24, 2007, Dr. Gizzo examined Taylor in advance of his surgery to remove the hardware in his back.  (R. 744.)  She noted that Taylor complained of a pinching in his lower back that was thought to be secondary to the hardware placement in his lower back.  (*Id.*)  Dr. Gizzo also stated that Taylor's HIV was stable.  (R. 745). Later, she examined him after his surgery and noted that Taylor was taking Vicadin on an as-needed basis.  (R. 741.)

Taylor saw Dr. Gizzo again on January 29, 2008 for a complete physical exam.

(R. 737.)  At this visit, Dr. Gizzo noted that claimant reported continued back pain.  (*Id.*)

Her physical exam revealed that patient was in "his usual state of health in no acute

distress."  (*Id.*)  She also noted that neurologically, he was grossly intact, his strength

was 5/5 throughout all extremities, and his gait was within normal limits.  (*Id.*)

Taylor again visited Dr. Gizzo on August 11, 2008.  (R. 734.)  At this visit, Dr.

Gizzo noted that Taylor's cholesterol level had dropped since Dr. Allen had switched his

medication.  (*Id.*)  She also noted that Taylor was experiencing some bilateral ankle

pain and limping, which she attributed to his back pain.  (R. 735).  She also stated that

Taylor had difficult sitting up from a lying down position.  (R. 734.)  She noted that

Taylor had consulted with Dr. Lorenz but that Dr. Lorenz was offering no further therapy.

(*Id.*)  Taylor also indicated to Dr. Gizzo that Dr. Lorenz would no longer be prescribing

Vicodin to Taylor.  (*Id.*)  Dr. Gizzo advised Taylor that he should try 600-800mg of

ibuprofen, but also gave him a prescription for Vicoprofen if the ibuprofen was

insufficient.  (R. 735.)

On September 1, 2009, Dr. Gizzo noted that Taylor was still experiencing chronic

lower back pain and had no further therapeutic options.  (R. 725.)  She stated that

Taylor was in no acute distress until he tries to sit still or lay flat on the exam table.  (*Id.*)

Dr. Gizzo also indicated that Taylor was not receiving any relief from the ibuprofen or

Vicoprofen.  (*Id.*)  She prescribed him Ultram ER 300 as an alternative.  (*Id.*)  On March

4, 2009, Dr. Gizzo noted that Taylor still had a "significant" lower back problem.  (R.

728.)  She further stated that Taylor was unable to exercise or walk on the treadmill.

(*Id.*)

On April 20, 2010, Dr. Gizzo noted that Taylor could not deal with the side effects

associated with the Ultram.  (R. 795.)  She noted that Taylor had been on long term Vicoprofen to control his lower back pain, and no other pain medications have proved effective.  (*Id.*)

### 3. Dr. Allen

Dr. Allen is a specialist in HIV infections, and since 2000, claimant has seen Dr. Allen on a regular basis.  (R. 212-66, 352-96, 482-532, 665-72, 678-705.)  Throughout this time, Dr. Allen has consistently noted that claimant's HIV was under control and did not negatively affect him in any way.  (*See e.g.,* R. 18, 389, 395 noting that claimant's HIV was "totally asymptomatic" and "very stable".)  On January 3, 2008, Dr. Allen noted that Taylor was still suffering from back pain and was currently being evaluated for total disability in connection with his back injury.  (R. 389.)

### 4.  State Agency Physician

In January of 2008, state agency reviewing physician Dr. Richard Bilinksy assessed the following restrictions: occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds; standing, walking and sitting each for about 6 hours; never climbing ladders, ropes and scaffolds; and occasionally stooping, kneeling, crouching and crawling.  (R. 474-81.)  This opinion was in agreement with the FCA that had been performed, except that Dr. Bilinksy did not agree with the 20 minutes of sitting and 60 minutes of standing restrictions.  (R. 481.)

## C.  Claimant's Testimony

Taylor testified before the ALJ on December 21, 2009.  (R. 33-50.)  He was 45 years of age at the time of the hearing, and he was represented by counsel.  (R. 34,

37.)  Taylor is married and has two minor children at home, ages 10 and 11.  (*Id.*)  He also testified that he graduated from high school, but has no other formal education.  (R. 38.)

Taylor testified that he is a carpenter by trade, and he has never worked in any other occupation.  (R. 40.)  He explained that prior to his injury he worked in a wood shop constructing custom items, such as spiral staircases.  (R. 39-40.)  Taylor also stated that he has not worked since November 15, 2005.  (R. 38-39.)  Claimant testified that he first stopped working on March 24, 2004, the date of his initial injury.  (R. 38.)  Claimant said that he was injured while working on a curved staircase with a fellow employee.  (R. 40.)  He explained that he injured his back while bending to set down a piece of wood; when he got up, he "couldn't move very well."  (*Id.*)

Taylor testified that he was out of work for a few months following the injury.  (R. 39.)  He said that he went to physical therapy during this time.  (*Id.*)  Taylor testified that he returned to light duty work sometime around June, 2005.  (*Id.*)  He explained, however, that after a few months, the pain was too bad and he decided he needed surgery.  (*Id.*)  He stated that he stopped working in his light duty capacity on November 15, 2005, and he alleges disability from that date.  (*Id.*)

Taylor testified that at the time of the hearing, it had "been quite a while" since he had seen any doctor for his back problems.  (R. 40.)  Taylor said he was currently taking Vicodin and Vicoprofen for his pain symptoms.  (R. 41.)  Claimant testified his stomach is sometimes upset by the Vicodin, but that he could tolerate it and he experienced no other side effects.  (*Id.*)  He also testified that he had to take more Vicoprofen than he should to get any relief from his symptoms.  (R. 42.)  He noted that these medications

were prescribed by his primary care internist, Dr. Gizzo, whom he sees about every six months.  (R. 41.)  He also explained that he sees Dr. James Allen about every six months to monitor his HIV.  (R. 40.)

Taylor testified that he had a fusion (back) surgery, and the hardware in his back was subsequently removed.  (R. 42.)  He said he attended physical therapy, but this only made his symptoms worse.  (R. 42-43.)  He said that now the pain in his back is constant but varies in intensity.  (*Id.*)  He also explained that his pain is only in his back, and does not radiate down to his legs or knees.  (R. 42.)

Taylor further explained that the pain limits his ability to do various physical activities.  (*Id.*)  Taylor said that he lifts as little as possible, but can probably lift 10 pounds.  (R. 44.)  He said that he can walk to the end of his block, but that he is in pain the whole time, and his knee wants to pop out.  (R. 43.)  Additionally, he said that he can sit for about 15 to 20 minutes, but then he gets fidgety and needs to move.  (*Id.*)  He can also stand for 15 to 20 minutes but he's "constantly up and down all day, just trying to move around.... and [the pain] doesn't go away." (*Id.*)  Claimant also testified that he can squat without bending his back, but he has very limited forward flexion.  (*Id.*)

Although Taylor testified that sitting or standing does not relieve his pain, he stated that alternating positions helps to keep his mind off the pain.  (*Id.*)  He said he gets the most pain relief by lying down, and he cannot make it through a day without doing so.  (R. 48.)  He stated that he needs to lay down at least 3 or 4 times every day. (*Id.*)  Additionally, Taylor stated that he takes medication for his HIV, which makes him fatigued all the time.  (R. 44.)  He also testified that he has a difficult time concentrating, which affects his interactions with other people, including his children.  (R. 49.)  He also

12

has trouble sleeping, waking up several times during the night due to the pain caused by rolling over.  (R. 44.)

In terms of his daily activities, claimant testified that he does not have any difficulty showering, shaving or combing his hair.  (R. 44.)  Additionally, he said that he gets his kids ready for school, he drives them to school, and helps them with their homework when they return home.  (*Id.*)  He also said that he plays board games and video games with his children, but does not take them to the park.  (R. 45.)  He said that he attends some school functions for his kids, but that he has stopped going to church because it is hard for him to sit through due to his back pain.  (R. 45.)  Claimant testified that he does cook meals and do some light shopping. (R. 44-45). He also said that he does some light vacuuming, but his wife has to carry the vacuum up and down the stairs.  (*Id.*)  He testified that he used to be able to mow the lawn, shovel the snow, and do some yard work, but his wife now takes care of these household chores because he is unable.  (R. 50.)

**D.  Vocational Expert's Testimony**

Vocational Expert Edward Padella (the "VE" or "VE Padella") also testified on December 21, 2009.  (R. 50-54.)  The ALJ asked the VE to describe claimant's past work.  (R. 51.)  VE Padella classified Taylor's past work as a custom woodworking carpenter.  (*Id.*)  He stated that, according to the Dictionary of Occupational Titles ("DOT"), this is a skilled position that requires a medium level of physical tolerance.  (*Id.*)  The VE also said that it requires a heavy level of physical tolerance as normally performed.  (*Id.*)

The ALJ then asked VE Padella whether a hypothetical claimant who is identical

in age, education and work experience to Taylor, who has a residual functional capacity ("RFC") to perform light work (excluding climbing ladders, ropes, or scaffolds), and who can occasionally balance, stoop, kneel, crouch and crawl, could perform any of Taylor's past relevant work.  (R. 52.)  The VE testified that such a hypothetical person could not perform any of Taylor's past relevant work.  (*Id.*)  He further testified that this hypothetical individual would be able to perform a variety of unskilled, light occupations, such as a cashier, an assembler, or a packager.  (R. 52.)

The ALJ also asked whether the VE believed that the same hypothetical individual, who was further limited to sedentary work and required a 5-10 minute break to stand up every 2 hours, would be able to perform any unskilled occupation.  (R. 52.) VE Padella testified that such an individual could perform the work of several unskilled positions, including hand sorter, bench packager and hand assembler.  (R. 53.)

Lastly, the ALJ asked the VE whether there are any unskilled occupations available to a hypothetical individual who is able to lift and carry 5-10 pounds frequently, needs to alternate positions at will (sit, stand or walk as he/she pleases), is likely to miss 3 days of work per month, and cannot tolerate even a low stress job.  (R. 53.)  VE Padella said that no positions were available that would accommodate an individual in that capacity.  (*Id.*)

Claimant's counsel asked the VE to assess a variation of the ALJ's second hypothetical.  (R. 53.)  Specifically, he asked if the same hypothetical individual, who was limited to sedentary work and required a sit/stand option every 2 hours for 5-10 minutes, could find an unskilled occupation that would also allow for that individual being off task because of pain 3-4 times per day.  (R. 53.)  VE Padella testified that

14

there would be no work for this type of individual because no employer would tolerate an employee being off-task that often.  (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th

Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B. Analysis under the Social Security Act**

In order to qualify for DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis in reaching her decision to deny Taylor's request for benefits. At step one, the ALJ found that Taylor was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity since November 15, 2005. (R. 17.) At step two, the ALJ found that Taylor suffered from

disorder of the spine (post fusion at L4-S1) and HIV, which were "severe impairments" that limited his ability to perform the full range of basic work activities. (*Id.*) The ALJ also noted that Taylor suffered from dyslipidemia, but concluded that this condition was stable and had a minimal effect on his ability to find work. (R. 17-18.)

At step three, the ALJ found that Taylor's impairments, considered individually and in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 18.) In reaching this conclusion, the ALJ considered Listing 1.04 (disorder of the spine), but determined that this classification was inappropriate because Taylor's impairment did not result in a compromise of a nerve root and did not result in an inability to ambulate effectively. (*Id.*) The ALJ also considered Listing 14.00 (immune system), but determined that because Taylor's HIV condition was "considered stable," he did not have "the documented manifestations necessary...to meet or equal this listing." (*Id.*)

At step four, the ALJ concluded that Taylor had a residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 CFR 404.1567(b). (R. 18-24.) The ALJ concluded that Taylor should never climb ladders, ropes, or scaffold. (R. 18.) Additionally, the ALJ found that Taylor can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (*Id.*) The ALJ then found that Taylor was unable to perform any of his past relevant work. (R. 24.) At step five, however, the ALJ found that Taylor was capable of performing other jobs existing in significant numbers in the national economy. (R. 25.) Therefore, the ALJ concluded that Taylor was not disabled as that term is defined in the Act. (R. 26.)

On appeal, Taylor argues that the ALJ erred in not giving the findings of Taylor's

treating physicians controlling weight and in not accepting the treating physicians' conclusions that Taylor was disabled. Taylor also argues that the ALJ did not consider all the factors in the RFC that limited Taylor's ability to work. Lastly, Taylor argues that the ALJ's credibility determination of Taylor's level of pain was flawed. We address each of these arguments below.

## C. The ALJ Properly Gave the Treating Physician's Opinion Little Weight

Taylor first contends that the ALJ erred in discounting Dr. Lorenz's opinion that he suffered from extreme limitations and his conclusion that Taylor is disabled and cannot work. The ALJ stated that after considering Dr. Lorenz's opinions and assessments, she was giving them only "little weight" because she found Dr. Lorenz's opinions on Taylor's limitations and disability were inconsistent with his treating notes and findings. (R. 23.) She also found Dr. Lorenz's findings "somewhat exaggerated to unduly help the claimant with his disability application." (*Id.*)

It is well settled that a treating physician's opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Similarly, "medical opinions upon which the ALJ should rely need to be based upon objective observations and not amount merely to a recitation of claimant's subjective complaints." *Zblewski v. Astrue*, 302 Fed. Appx. 488, 493 (7th Cir. 2008); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("if the treating physician's opinions appear to be "based solely on the patient's subjective complaints, the ALJ may discount it." (*quoting* 20 C.F.R. § 404.1527(d)(2))). "An ALJ must minimally articulate

her reasons for discounting a treating source's opinion." *Dampeer v. Astrue,* 826 F.

Supp. 2d 1073, 1082 (N.D. Ill. Oct. 21, 2011) (internal quotations omitted). "This

standard is 'a very deferential standard that we have, in fact, deemed lax.'" *Id.* (*quoting*

*Berger v. Astrue*, 516 F.3d 539, 454 (7th Cir. 2008); *accord Elder v. Astrue*, 529 F.3d

408, 415 (7th Cir. 2008). "Once well-supported contradictory evidence is introduced,

the treating physician's opinion is no longer controlling but remains a piece of evidence

for the ALJ to weigh." *Dampeer,* 826 F. Supp. 2d at 1082.

First, the ALJ correctly notes that a determination of whether claimant is

"disabled" for purposes of the Act is an administrative finding reserved for the

Commissioner, rather than a medical opinion. *Id.* We also agree with the ALJ that Dr.

Lorenz's ultimate finding of extreme limitations was inconsistent with his prior opinions,

not supported by medical evidence and appeared to be based solely on Taylor's

subjective complaints. On March 12, 2007, just after Taylor's surgery for the hardware,

Dr. Lorenz noted that Taylor had a negative straight leg raise, he had a well-healed

scar, and he had strength of 5/5 in his lower extremities. (R. 316.) Shortly thereafter,

on March 27, 2007, Dr. Lorenz noted that although Taylor was still experiencing some

pain, the wound looked excellent and he was neurologically intact. (R. 314.) On April

24, 2007, Taylor's pain was only a 3 out of 10, and Dr. Lorenz again noted that the

wound looked excellent and Taylor was neurologically intact. At this appointment, Dr.

Lorenz also noted that Taylor would be released with some restrictions after an FCA

was performed.

On June 26, 2007, although Taylor complained of pain, Dr. Lorenz's notes

indicate that his interbody and posterolateral fusion at L4-L5 and L5-S1 were

unchanged and he had a well-preserved disk.  He also noted that although he was guarded and slow, he was able to walk without difficultly and he had a negative leg raise.  He also stated that Taylor was not given any pain medication.  In July of 2007, Dr. Lorenz approved the FCA, which rendered Taylor capable of light duty.  He stated that Taylor was capable of performing work at light duty (with some restrictions), and he noted that Taylor was at maximum medical improvement and "no further intervention [such as rehab or additional injections] is needed."

Without explaining his about face, Dr. Lorenz makes contradictory findings when Taylor returns in 2008.  In February and March of 2008, Dr. Lorenz opined that Taylor will likely need to pursue permanent disability, given his sitting, standing and walking restrictions.  This conclusion appears to be based solely on Taylor's subjective complaints that he cannot sit or stand for more than a few hours before lying down and that he has difficulty walking without experiencing fatigue.  However, the objective medical evidence from these visits is not consistent with this conclusion that Taylor is completely disabled.  For example, Dr. Lorenz noted that Taylor's pain was only at a 3, and although it *can* get up to an 8, his pain is, on average, only a 3 or 4 out of 10.  (R. 551, 556.)   Dr. Lorenz also stated that Taylor is taking Vicodin for pain only one to three times per week, and a CT scan from Taylor's last visit indicates "good interbody fusion and good posterial lateral fusion" and "no herniation" or impeding of the foramen.  (R. 556.)

Similarly, Dr. Lorenz's opinions in his questionnaire responses also appear based on claimant's subjective complaints, as there is no objective evidence to corroborate these conclusions.  Taylor was not examined at the time Dr. Lorenz provided these

responses, and he had not been examined in over a year. Dr. Lorenz describes Taylor's pain as an 8, but again, the treatment notes actually state that his pain ranges from 3 to 8 and is, on average, a 3 or a 4. In addition, the physical limitations set out in these questionnaires appear to be a mere recitation of Taylor's complaints, and courts in this Circuit have consistently held that this type of recitation, without more, is not entitled to controlling weight. *Zblewski*, 302 Fed. Appx. at 493 ("medical opinions upon which the ALJ should rely need to be based upon objective observations and not amount merely to a recitation of claimant's subjective complaints").

Accordingly, we find that the ALJ was correct to discount Dr. Lorenz's opinion because it was not supported by objective medical evidence and it appears to be based solely on Taylor's subjective complaints of pain. *See Zblewski*, 302 Fed. Appx. at 493; *Ketelboeter*, 550 F.3d at 625 (rejecting findings of treating physician where they were "based almost entirely on [claimant's] subjective complaints rather than on objective evidence"). In reaching this conclusion, the ALJ also noted that she had credibility issues with claimant's complaints of pain (discussed in more detail below), which renders Dr. Lorenz's conclusions even more questionable. The ALJ noted that Dr. Lorenz's findings of disability were inconsistent with his prior findings. Because the ALJ pointed to medical evidence that was "inconsistent or insufficiently objective," the ALJ provided the "good reasons" required for discounting Dr. Lorenz's testimony. *Zblewski*, 302 Fed. Appx. at 493.

Claimant argues that "one of the special considerations of concern to Dr. Lorenz was the HIV" and "this was not considered by the ALJ." (Cl's Br at 12.) We find this argument confusing for a couple of reasons. First, it does not appear from the record

that Dr. Lorenz relied on claimant's HIV at all in making his finding that claimant suffered from severe limitations. Moreover, the ALJ did consider claimant's HIV in rendering her decision. (R. 21.) Indeed, she correctly noted that there are numerous references in the medical record to the fact that claimant's HIV was asymptomatic, stable, and not an impediment to his ability to work. (*Id.*)

The ALJ also declined to give "controlling weight" to the opinion of Dr. Gizzo, claimant's internist. Dr. Gizzo stated that claimant had not been able to be gainfully employed, but again, this determination is one that is left to the Commissioner. *Dampeer*, 826 F. Supp. 2d at 1082. Dr. Gizzo's medical records also provide no support for her opinion that claimant cannot work. Her treatment notes reflect numerous 5/5 strength tests, negative leg raises, no difficulties with walking, and that claimant's HIV was consistently stable. Moreover, Dr. Gizzo is not a specialist in back injuries; rather, she is an internist. See *Dampeer,* 826 F. Supp. 2d at 1083 (refusing to give treating physician controlling weight because, among other things, he was not a specialist in claimant's injury). For all of these reasons, we do not agree with claimant that the ALJ erred in giving Dr. Gizzo's opinion only "little weight."

### D. Claimant's Remaining Arguments Are Also Without Merit

Next, Taylor argues that the ALJ did not properly consider all the facts in the residual functional capacity assessment that limited his ability to work. For example, claimant argues that the VE testified that claimant would not be able to work if claimant missed three days of work per month. Claimant insists that "with all the heath problems ... with his surgeries, doctor appointments and many health issues, he would miss more than three days of work per month." However, we find that this argument is without

merit.  While we agree that claimant has some health issues, his testimony was that he only saw Dr. Allen, his HIV physician, and Dr. Gizzo, his internist, once every six months, and that he had not seen Dr. Lorenz in "quite some time."  (R. 40.)  He had two surgeries, and there is no evidence in the record to suggest there would be more; in fact, with respect to his back, Dr. Lorenz opined that no further intervention was necessary.  Thus, the evidence in the record does not support claimant's argument that he will have to miss more than three days of work per month.

Similarly, claimant argues that the ALJ did not factor in claimant's need to lay down after any activity in order to relieve pain.  This argument is related to claimant's final argument that the ALJ erred in making her credibility finding regarding Taylor's alleged limitations due to pain.  When faced with a claimant's allegations of subjective symptoms, such as pain, the ALJ must make a credibility determination.  *Dampeer,* 826 F. Supp. 2d at 1084.  "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."  *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).  Accordingly, we reverse credibility determinations only if they are "patently wrong."  *Id.*  Despite this "special deference," the ALJ is still required to articulate her reasoning and discuss or distinguish any relevant contrary evidence."  *Clifford,* 227 F.3d at 870.

We have reviewed the ALJ's credibility determination and we do not find that it is patently wrong.  She noted that the occasional use of pain medication (for example, Vicodin just one to three times per week, infrequent refills) suggests that Taylor's pain is not as severe or disabling as he claims.  (R. 21-22.)  She also noted that the overall medical evidence (such as consistently good strength, negative straight leg raises, and

Dr. Lorenz's notes endorsing the FCA for light duty work) only partially corroborates Taylor's complaints regarding pain.  Finally, the ALJ noted that the claimant's daily activities undermined his alleged disabling pain, such as playing video games with his kids, vacuuming, doing some light shopping and cooking.  He also testified that he had no difficulty with personal grooming, such as showering or shaving, he attended school functions and drove his children to and from school.  Based on these factors, the ALJ determined that "claimant is not fully credible to the extreme limitations that he described."

We cannot conclude that the ALJ erred in making her credibility determination.  She addressed claimant's testimony, his daily activities, the medical evidence, treatment history and his use of pain medication.  *See Dampeer,* 826 F. Supp. 2d at 1084.  (listing the relevant factors in the credibility determination).  The ALJ did agree that the claimant suffered from some restrictions, and as a result, she provided reasonable limitations based on his impairments.  The ALJ has built the requisite "logical bridge" in making her credibility determination.  *See, e.g., Berger*, 516 F.3d at 545 (upholding ALJ's adverse credibility determination regarding constraints imposed on claimant by back pain where claimant performed household chores and went fishing).  On our review of the record, we do not believe her credibility findings were "patently wrong."

### III. CONCLUSION

For the reasons set forth above, Taylor's motion for summary judgment is denied. It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated:      June 29, 2012